UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

JOSE M. CHAVEZ-ARELLANO      )
                  Plaintiff,      )
                              )
     v.                       )        Civil Action No. 05CV2503 (RMC)
                              )
UNITED STATES DEPARTMENT      )
OF JUSTICE et al.,            )
                  Defentants

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff ask the Court to deny defendants motion for Summary Judgment.

## A.  Introduction

1.   Plaintiff is Jose Miguel Chavez-Arellano, Pro-se; Defendants are the United
     States Department of Justice, Federal Bureau of Investigations ("FBI"),
     Executive Office for the United States Attorneys ("EOUSA"), and the Drug
     Enforcement Administration ("DEA").

2.   On November 23, 2005, Plaintiff sued defendants for declaratory and injunctive
     relief. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.
     C. §552, as amended, and the Privacy Act ("PA"), 5 U.S.C. §552a, to order the
     production of agencey records, consisting of all records in agency's system of
     records previously requested by Plaintiff pursuant to the above referenced acts.
     Those records have been unlawfully withheld by the Defendants.

3.   On March 10, 2006, Defendants' filed a motion for Summary Judgment of Plaintiff's
     cause of action for the production of agency records related to Plaintiff.

1

RECEIVED

APR 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

4.   Summary Judgment is improper in this case because there are genuine issues of fact on each element of Plaintiff's cause of action for the disclosure of Plaintiff's Criminal Case records.

5.   In support of this Memorandum, Plaintiff refers this Honorable Court to the attached arguments and documentary evidence contradicting the assertion in the Defendants' motion. See. Neal V. Kelly, 963 F.2d. 453 (D.C. Cir 1992); Local Civil Rule 7(h); and Fed. R. Civ. P. 56(e).


## B.   Nature of Plaintiff's Criminal Case

6.   On March 13, 2000, Plaintiff and his only co-defendant, Mr. Rosalio Morales-Cabrera were arrested by Drug Enforcement Administration (DEA) agents, acting in an undercover capacity, and charged in a four-count indictment filed in the Southern District of Texas, at Laredo Division, with Conspiracy to possess with intent to distribute approximately fourteen pounds of methamphetamine, in violation of 21 U.S.C. §§846, 841(a)(1) and 841(b)(1)(A).

7.   On March 1, 2000, the DEA agents met Mr. Morales, for the purpose of negotiating the purchase of methamphetamine. Mr. Morales delivered to agents 173 grams.

8.   On March 4, 2000, agents met Mr. Morales for the sale of one-half pound of meth.

9.   On March 7, 2000, Mr. Morales delivered to agents 150.6 grams of meth.

10.  On a final meeting on March 13, 2000, agents met with Mr. Morales for the sale of thirteen pound of meth. Mr. Morales was in the company of Plaintiff. Both defendants were arrested in the parking lot without incidents.

11.  On May 22, 2000, Mr. Morales entered into a plea and agreed to testify for the government against Plaintiff. At the conclusion of Plaintiff's three day jury

trial. Plaintiff was convicted by the jury and sentenced to <u>235</u> months of prison. (Morales was sentenced to <u>27</u> months).[[See Appendix **A** ]]

## C.    Statement of Facts

**Plaintiff's FOIA Requests to the F.B.I.**

12.    On January 7, 2004, Plaintiff submitted three (3) standard form FOIA/PA requests to the FBI. Two of these three requests were directed to Washington, D.C. and one more to Houston, Texas. Requesting "Each and every record related to requestor". Also, "Any and all fingerprint analysis and/or fingerprint records in the agency files". Plaintiff included a properly certificate of identity and I.D. copy with his requests. [See Plaintiff complaint at ¶ 8]

13.    Mr. David M. Hardy, who currently is the section Chief of the record/information Dissemination Section, acknowledged and declared that "specifically, I am aware of the handling of the FOIA request of Plaintiff, Jose M. Chavez-Arellano, which seeks access to records pertaining to himself and "DEA LAB ANALYSIS OF METHAMPHE-TAMINE AND FINGERPRINT ANALYSIS." [See Hardy Decl. at ¶ 3]

14.    Moreover, FBIHQ advised Plaintiff that a search of the automate indices to the CRS files at FBIHQ located "no records" responsive to his FOIA request for records concerning himself and the "DEA LAB ANALYSIS OF METH AND FINGERPRINT ANALYISIS." [See Hardy Decl. at ¶ 8,12,14]

15.    However, the record indicates that the FBI limited its search for information about Plaintff to files that it could located by searching its Central Records System (CRS) index, which is capable of locating most, but not all, documents responsive to a general request for information about a particular subject.

Moreover, Plaintiff expressly requested search separated branches and offices for the requested records. [See, Plaintiff Complaint exhibit A]

**Plaintiff's FOIA Requests to the E.O.U.S.A.**

16.     On January 7, 2004, and January 21, 2004, Plaintiff forwarded FOIA requests to Defendant (EOUSA). These requests sought "All records related to Plaintiff maintained in the agency's system of record, a expedited consideration, and a search of other branches and offices for the requested records, specially in the Southern District of Texas, Laredo Division, whereas Plaintiff's criminal records were created". [See Boseker Decl. at ¶ 14]

17.     By letter dated February 5, 2004, Defendant advised Plaintiff that a request for "all information about myself in criminal case files" were usually "Project Requests", that could take approximately nine (9) months to process. [2] [See Boseker Decl. at ¶ 15]

18.     On February 26, 2004, Plaintiff sent a letter to the EOUSA in which he reasserted his request for "all information/(records) about myself in criminal case files", contained in agency's system of records. [See Boseker Decl. at ¶ 17]

19.     Four months later, on June 10, 2004, Plaintiff forwarded a final demand letter, stating he has not received response to any of his communications.

20.     On July 6, 2004, Plaintiff recieved only nine (9) pages of information. Obviously, it was not "each and every record related to requestor", as requested previously by Plaintiff. [See Boseker Decl. at ¶ 20]

---

[2] Until today March 30, 2006, more than two years after Plaintiff's initial requests were submitted, Plaintiff has not received the "Project Request", in regard to "all information about myself in criminal case file."

21.   This same letter notified Plaintiff that EOUSA had applied FOIA exemptions 5
      U.S.C. §552(b)(5) and (b)(7)(d), and PA exemptions 5 U.S.C. §552a(j)(2) to
      to withhold material.

22.   Also, on July 6, 2004, Plaintiff was advised that "the fingerprint records, and
      Lab No. 138466, 138567, and 138568 are "not located in our offices or the
      Souther District of Texas, these records may have originated with the DEA...".

23.   On August 17, 2004, Plaintiff filed an appeal with the OIP regarding EOUSA's
      actions. Plaintiff asserted that he has been prejudiced for the EOUSA bad faith
      denial, since the failure to disclose these records preclude Plaintiff to pursue
      a fair post-conviction relief, violating Plaintiff's Fifth Amendment, right to
      due process, the fundamental right to prove his innocence and his right to
      correct his record. Since Plaintiff is collaterally attacking his conviction
      the withholding of Plaintiff's records would result in a miscarriage of justice.

24.   Furthermore, the EOUSA through Mr. Boseker agreed that "all of the records
      reviewed by EOUSA in response to Mr. Chavez-Arellano's request(s) were located
      in the USAD/SDTX. The records are maintained in the Criminal Case File System
      (Justice/USA-007) and in the Criminal Case File, U.S. v. Jose Chavez-Arellano,
      00-CR-355. [See Boseker Decl. at ¶ 23]

**Plaintiff's FOIA Requests to the D.E.A.**

25.   Since December 4, 2001, Plaintiff through the FOIA/PA has been unsuccessfully
      seeking and requesting a copy of his Criminal Case records. [See Wasson Decl.,
      DEA Paralegal Specialist at ¶ 6]

26.   On July 9, 2003, Defendant DEA informed Plaintiff that DEA file number Plaintiff
      provided was queried and produced negative results as it also is not a DEA file

number. [See Wasson Decl. at ¶ 17]

27.    Additional NADDIS queries were conducted on January 24, 2003, upon receipt of
       Plaintiff's FOIA requests dated January 7, 2004, and on August 3, 2004, upon
       receipt of a referral of one page from EOUSA. "No additional" documents were
       located pursuant to the second and third NADDIS queries. [See Wasson D. at ¶34]

28.    However, contrary to the above asserted declarations, the DEA's Paralegal as-
       serted; "As a result of the NADDIS query, the EOUSA referral, and results of
       the searches of DEA's Laredo, Texas and Houston, Texas Field Offices, 144 pages
       of material responsive to Plaintiff's requests to DEA and EOUSA were identified.
       [See Wasson Decl. at ¶ 35]

29.    Therefore, on March 7, 2006, 3½ months after Plaintiff had filed this Complaint
       "coincidentially" received a letter from the DEA stating; "Enclosed please find
       "portions" of 16 pages and 23 pages in their entirety that are responsive to
       your FOIA/PA requests.³ [See Wasson Decl. at ¶ 35] [[ See Appendix **B** ]]

### D.    Standard of Review

30.    Although Summary Judgment is proper in any case where there is no genuine issue
       of material fact, this is not a case where the Court should grant Summary Judg-
       ment. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)

31.    A defendant who seeks Summary Judgment on a Plaintiff's cause of action must
       demonstrate the absence of a genuine issue of material fact by either (1) sub-
       mitting Summary Judgment evidence that negates the existence of a material
       element of Plaintiff's claim or (2) showing there is no evidence to support an

---

³ Plaintiff has attached (5) copies of the "Portions" of the 16 pages, to show
   this Honorable Court the DEA's bad faith in disclose the requested informa-

essential element of Plaintiff's claim. Celotex Corp., 477 U.S. at 322-25, 106

S.Ct. at 2552-54; J. Geils Band Employee Benefit Plan v. Smith Barney Shearson,

Inc., 76 F.3d. 1246, 1251 (1st Cir. 1996) Defendant cannot rely on conclusory

statements to establish that Plaintiff has not presented evidence on an essen-

tial element of his claim. Rather, defendant must demonstrate an absence of

genuine factual dispute. See, Celotex Corp., 477 U.S. at 327, 106 S.Ct. at

2555. Only if defendant meet its burden is Plaintiff required to respond by

Summary Judgment proof to show a genuine issue of material fact. Fed. R. Civ.

P. 56(e).

32.     In determining whether there is a disputed issue of material fact that preclu-

des Summary Judgment, the Court must consider all evidence in the light most

favorable to Plaintiff as the non-movant. Hom v. Squire, 81 F.3d. 969,973 (10

Cir. 1996).


E.     **Argument and Authorities**

33.     The Supreme Court repeatedly has stressed the fundamental principle of public

access to Government documents that animates the FOIA. "Without question, the

Act is broadly conceived. It seeks to permit access to official information

long shielded unnecessarily from public view and attempts to create a judi-

cially enforceable public right to secure such information from possibly un-

willing official hands". John Doe Agency v. John Doe Corp., 493 U.S. 146; EPA

v. Mink, 410 U.S. 73,80 (1973).

34.     The Act's "basic purpose reflected 'a general philosophy of full agency dis-

_____

tion. Also, the 23 "in their entirety" disclosed pages were not requested
by Plaintiff.

closure unless information is exempted under clearly delineated statutory

language." Department of Air Force v. Rose, 425 U.S. 352 (1976).

35.    "The basic purpose of FOIA is to ensure an informed citizenry, vital to the

functioning of a democratic society, needed to check against corruption and

to hold the governor accountable to the governed." NLRB v. Robbins Tire &

Robber Co., 437 U.S. 214, 242 (1978).

36.    There are, to be sure, specific exemptions from disclosure set forth in the

Act. "But these limited exemptions do not obscure the basic policy that disclo-

sure, not secrecy, is the dominant objective of the Act." Rose Id. at 361.

37.    Accordingly, these exemptions "must be narrowly construed." Furthermore, "the

burden is on the agency to sustain its actions. Id; 5 U.S.C. 552(a)(4)(B).

38.    Thus, the purpose of the FOIA was to correct improper denials of requests for

public information by various federal agencies. FDIC v. Ernst &Ernst, 677 F.

2d. 230,232 (1982).

### Evidentiary Standard for Summary Judgment

39.    A genuine issue of material fact is one that would change the outcome of the

litigation. "The burden on the moving party may be discharged by 'showing' --

that is, pointing out to the [court] -- that there is an absence of evidence

to support the non-moving party's case". Sweats Fashions, Inc. v. Pannill

Knitting Company Inc., 833 F. 2d. 1560, 1563 (Fed Cir 1987). Once the moving

party has met its burden, the non-movant -- here Plaintiff -- may not rest on

mere allegation, but must instead proffer specific facts showing that a

genuine issue exist for trial. Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986). Thus, to avoid Summary Judgment here, Plain-

tiff will present some objective evidence that would enable the court to find he is entitle to relief.

40.   In Celotex Corp. v. Catrett, the Supreme Court held that, in responding to a proper motion for Summary Judgment, the party who bears the burden of proof on an issue at trial must make a sufficient showing on an essential element of his case to establish a genuine dispute. 477 U.S. 317, 322-23 (1986).

41.   Thus, government affidavits and memorandum of law could not conclusively, establish extent of exempt material whose disclosure was sought under 5 U.S.C. §552, since the determination of exempt material was within the court's province alone. Rabbitt v. Dept. of Air Force, 383 F.Supp. 1065, 1068, (D.C.N.Y. 1974); Also See, 5 U.S.C.A §552 (a)(3),(b),(1,2,5,6); 18 U.S.C.A.§3500.

## Defendant F.B.I.

42.   Summary Judgment is improper because issues of material fact still exist as to whether all data sought by Plaintiff's requests through FOIA/PA were produced; and whether a thorough search for the seeking document has taken place.

43.   On January 7, 2004, Plaintiff submitted two (2) different request to FBI headquarters at Washington, requesting "Each and every record related to Plaintiff in agency file". Also, requested "Any and all fingerprint analysis and/or fingerprint record in your agency files." Plaintiff also requested a search of other branches and offices for the requested records.

44.   On the above mentioned date, Plaintiff also forwarded a request to the FBI Houston Field, requesting the same information as the Washington's requests.

45.  However, the Defendant FBI restricted its search only to the Central Records System (CRS) at its Headquarters and Houston field, arguing that such offices located "no records" responsive to Plaintiff's FOIA requests.

46.  Plaintiff clearly specified on the face of each request that his Criminal records were created at the U.S. District Court of Texas, Laredo Division, Criminal Case No. 5:00-CR-355. In addition, Plaintiff requested a search of other FBI's offices for the requested records.

47.  Defendant FBI claimed it made a thorough search for the requested records, which, by the way, must include any form 302 field interview report which pertain to Plaintiff. However, the FBI states it has "no responsive" records whatsoever, which simply cannot be the case (e.g. every federal prisoner has a FBI number and fingerprints on file, which must be part and parcel to some responsive document).

48.  Moreover, Defendants bounced Plaintiff from one agency to the next in regard to the requested fingerprint analysis, or fingerprint records.

49.  For example, Defendant (EOUSA) notified Plaintiff that "specific records regarding fingerprints could be sought from the DEA." [See Boseker Decl. at 21]

50.  The DEA informed Plaintiff that its records do not contain fingerprint analysis, and suggested to contact the FBI. [See Wasson Decl. at ¶ 9]

51.  And, finally, the FBI said; "the Central Records System (CRS) located "no records" responsive to Plaintiff's FOIPA request for records concerning DEA LAB ANALYSIS OF METHAMPHETAMINE AND FINGERPRINT ANALYSIS."[See Hardy Decl ¶ 8]

52.  Therefore, the question for the Court is: Who has those records?.

53.   Plaintiff must know whether the DEA/FBI performed a fingerprint test of the
      five (5) bundles wrapped in brown tape containing brown powder, 14 pounds of
      drugs, seized in Plaintiff's Criminal case and where this results/report is
      filed in the record?

54.   During Plaintiff's jury trial, the second case agent Mr. Bernie Vasquez, (he
      was the case agent at the time of Plaintiff's arrest), stated to the jury:
      "Nobody processed the prints, that's correct". Then, Plaintiff's attorney
      asked: "And you being the case agent, you could have said we need to send this
      for fingerprints? You could have said it?". Answer: "Yes, sir, we could have".
      Question: "But it was not". Answer: Not to my knowledge".(TR;II Pg. 37,38,39-
      14/4). Furthermore, the third case agent, Mr. Jose Ruben Martin, stated: "It's
      uncommon to lift fingerprints off plastics contained where drugs are found."
      (TR:II Pg. 7-11/16). Then, Plaintiff's attorney questioned: "And we won't
      know whether there were any fingerprint because nobody took the precaution to
      send this material to have it tested for fingerprints, do we?" Answer: "I am
      not aware of that, but I believe not". (TR:II Pg. 13,14-25/8).[[See attached
      Transcripts, Appendix C ]]

55.   As this Honorable Court may discern, the government claimed it failed to take
      a fingerprint analysis of the 14 pounds of meth that were found inside a
      black nylon bag. This simply is not credible.

56.   Right after Plaintiff was arrested and transported to the DEA's office, at
      Laredo, Texas, Plaintiff personally observed a female DEA specialist dust the
      packages in question with fingerprint powder after first weighing them.

57.   Plaintiff request any and all documents which reveal or indicate that forensic
      and/or fingerprint testing came back from the lab and were or were no atribu-
      table to Plaintiff.

11

**Defendant E.O.U.S.A.**

58.   Since January 7, 2004, Plaintiff has been unsuccessfully seeking information related to his criminal case.

59.   On January 7, 2004, Plaintiff forwarded his initial request through the EOUSA Houston Field. Requesting; "Each and every record related to Plaintiff, in agency files. Also Plaintiff requested to search other branches and offices for the requested records, specially in the Southern District of Texas, Laredo Division. Plaintiff also included a list of the sought records and his criminal case No. 5:00-CR-355.

60.   By letter dated February 5, 2004, Defendant acknowledged to Plaintiff that his request had been receive and assigned FOIA No. 04-150.

61.   However, on July 6, 2004, Plaintiff received only nine (9) pages of information, and applied FOIA exemptions 5 U.S.C. 552(b)(5) and (b)(7)(C), and PA exemptions 5 U.S.C. §552a(j)(2) to withhold material.

62.   Plaintiff unsuccessfully appealed his denial of information, because, obviously, nine pages of information was not "any and every record related to Plaintiff's criminal case.

Request No. 04-184

63.   On January 10, 2004, Plaintiff forwarded his second request, through the EOUSA Washington, D.C. field, requesting,once again; "Each and every record maintained in the agency's system of records related to Plaintiff, but, now including a Vaughn Index of each and every record in Plaintiff's files. Plaintiff also, detailed the requested records and included his Case No. 5:00-CR-355.

64. By letter dated February 18, 2004, defendant EOUSA acknowledged to Plaintiff that his request had been received and assigned FOIA No 04-184. Defendant also advised Plaintiff that a request for "all information about myself in criminal files" are usually "Project Requests", that could take approximately nine (9) months to process.

65. On February 26, 2004, Plaintiff forwarded a letter to defendant asserting his second request (04-184) was, in fact, a project request. Plaintiff asked that defendant to disclose as soon as possible, a complete copy of Plaintiff's file ("all information about myself in criminal case file") defendant is holding and/or everything it has received from the court and/or prosecution, arguing Plaintiff has reason to believe that information contained in agency's system of records may show violations of Plaintiff's Constitutional and Civil Rights.

66. Plaintiff has the right to review his records under FOIA/PA, and the right to its correction. Moreover, the information that Plaintiff is seeking involves a possible question about the government's integrity, due to the overwhelming contradictions in Plaintiff's criminal case, which affects the public confidence.

67. Even though, Defendant acknowledged that it had interpreted Plaintiff's request as one for all the records concerning him, Plaintiff did not receive such records.

68. However, two (2) years later, Plaintiff has yet to receive his "Project Request", that according to defendant "could take approximately nine months to process".

69. On the other hand, Mr. Boseker, who is an Attorney Advisor in the EOUSA, acknowledged that "all of the records reviewed by EOUSA in response to Mr.

Chavez-Arellano's request(s) were located in the USAO/SDTX. The records are maintaned in the Criminal Case File System (Justice/USA-007) and in the Criminal Case File, U.S. V. Jose Chavez-Arellano, 00-CR-355.

70.    Once again, Plaintiff objects to the defendant EOUSA denial and request a complete copy of Plaintiff's criminal records unlawfully withheld in the EOUSA's agency files.

## Defendant EOUSA failed to produce a Vaughn Index.

71.    Summary Judgment is improper because issues of material fact still exist.

72.    Defendant did not submit a Vaughn Index of withheld documents or detailed justification for their non-disclosure.

73.    In order to prevail on motion for Summary Judgment in FOIA case, defending party must prove, via its Vaughn Indexes, that each document that falls within class requested either has been produced, is unidentifiable, or is exempt from FOIA's inspection requirement; district court must examine these Vaughn Indexes and conduct de novo review of all exemptions claims advanced. Bay Area Lawyers Alliance v. Dept. of State, 818 F. Supp. 1291,1295 (N.D.Cal.1992)

74.    In the case at hand, without a detailed Vaughn Index for the Court consider appropriateness of limited discovery, we cannot know which documents were withheld nor whether such information were really non-exempt for disclosure.

75.    Government must supply to FOIA requester any reasonably segregable, non-exempt portion of documents that are in part exempt from disclosure requirements, and government then bears burden of justifying nondisclosure on any withheld document or portions of documents and must supply requester with "detailed Indexes" itemizing each item withheld, exemptions claimed for it, and reasons

why exemptions applies to that item, and, to extent
necessary, government must supply affidavits in su-
pport of its claims of exemption. 5 U.S.C. §551 (1)
(B), 552 (a)(4)(B),(b)(5), (b)(7)(C,D); Fed. R. Cri
Pro Rule 32(c), 18 U.S.C.A.; Fed. R. Civ. Pro. Rule
24, 28 U.S.C.A.; U.S.C.A. Const. Art 3, § 1 et seq.

## Defendant D.E.A.

76. Since December 4, 2001, Plaintiff through different FOIA/PA requests, has
sought information in regard to his criminal case. However, Defendant DEA
has refused to disclose a complete copy of plaintiff's records, stating
that; 1) the DEA file number Plaintiff provided was queried and produced
negative results; 2) It is not a DEA file number; 3) Its records do not
contain fingerprint analysis; 4) information was withheld pursuant to FOIA/PA
exemptions; and 5) bounced Plaitiff from one agency to the next in regard to
the requested records.

77. It could be said, that defendant DEA was the agency directly involved in
Plaintiff's criminal investigation and subsequent arrest.

78. For instance, on the request dated December, 4, 2001, Plaintiff requested "the
DEA lab analysis of methamphetamine and fingerprint analysis." Defendant
assigned request No. 02-1370-F.

79. Plaintiff received 98 pages related "only" to the DEA lab analysis. Defendant
claimed its records do not contain fingerprint analysis. Also, exemptions
were claimed.

80. Therefore, Plaintiff's appeal was denied claiming that "the DEA properly
withheld from you certain information that is protected from disclosure under
the FOIA...".

15

81.    On April 17, 2003, Plaintiff submitted his second request, requesting "any and all fingerprints and/or fingerprint analysis regarding criminal case 5:00-CR-355, Laredo Division. DEA lab file 6000103".

82.    Defendant assigned request No. 03-1078-F. Also defendant claimed that "we were unable to locate any responsive document using the Criminal Case Number you provide... you may appeal this response".

83.    Also on the letter dated February 20, 2004, defendant suggested that "in order to receive information on fingerprints and analysis or fingerprints records you must contact the FBI directly."

84.    After Plaintiff exhausted his admininstrative remedies on the above two requests. Plaintiff re-started again. and:

85.    On January 10, 2004, Plaintiff submitted another FOIA/PA request, but, now requesting "Each and every record maintained by the DEA agency's system of records related to requestor, including a Vaughn Index of each and every record in files."

86.    Defendant dessigned request No. 04-1588-P, and on August 24, 2004, Plaintiff successfully received one (1) single page of information.

87.    Plaintiff appealed the denial of information regarding his criminal case. The appeal was affirmed claiming that this information was not appropriate for discretionary release.

88.    Moreover, On January 7, 2004, Plaintiff forwarded three (3) more requests, once again, requesting "each and every record related to Plaintiff". The records requested were, but not limited to; 1) any audio and video tape and transcripts; 2)DEA's reports; 3)DEA's debriefing statements; 4)memoranda and letters; 5)P&C

16

and O&C files; 6)electronic files; 7)database references; 8) (ELSUR); 9) any
surveillance photographs; 10)telephone records; 11)fingerprints results taken
from the seized drug; 12) any DEA's forms; 13)miscellaneous files; and 14)all
other information concerning Plaintiff which is contained in the DEA's pos-
session. Also, Plaintiff requested to search other branches and offices for
the requested records.

89.   Nevertheless, the defendant DEA never aswered these requests, nor did the
defendant turnover the requested files and materials.

90.   Furthermore, Plaintiff must know whether the audio-tapes that were recorded
during Plaintiff's Criminal investigation were transcribed.

91.   For example, during Plaintiff's jury trial the government presented five (5)
audio tapes recordings. Plaintiff's attorney questioned the government's
witness, DEA agent, Mr. Bernie Vasquez: "You are saying that the second, third,
fourth, and fifth conversations were all also taped?" Answer: "As long as there
was a meet that occurred on those particular days, they were taped" (TR;II Pg.
33-10/21). Then, Plaintiff's attorney asked: "Do you recall hearing Chavez-
Arellano [Plaintiff] speak?" Answer: "I recall three voices, there were dif-
ferent voices..." Question: "Was one of them the waiter or waithress?"
Answer: "I believe the waithress came up once and asked something, but I don't
remember what the question was". (TR:II Pg.34-3/13).

92.   After this case agent acknowledged he heard the tapes. Another agent ironicaly
testified those tapes were inaudible.

93.   Government's witness, DEA agent Jose Ruben Martin was questioned: "And did you
listen to those cassette tapes?" Answer: "Yes. I listened to the audio cassette
tapes, but they were all inaudible..." Question: "And are you saying the four

tapes or the five tapes that you have, that they were all inaudibles?"
Answer: "Yes, to me, they were" (TR:II Pg.48-1/3). Question: "And where are
those tapes?" Answer: "I have them". Question: "And was that information ever
made part of the report?" Answer: "That they were taken, yes". Question: "Yes.
And that whatever is there was inaudible, was that make part of the report?"
Answer: "No". (TR:II Pg. 45-9/16).[See attached transcripts, Appendix D ]

94.  That is whay I need the requested information about the tape transcripts, and
copies of the actual tapes.

95.  Furthermore, neither Plaintiff nor his trial attorney received a copy of such
records (the tapes) pursuant to an alternative discovery devices. Plaintiff's
trial attorney never filed pre-trial motion for discovery, but this failure
should not bar Plaintiff from receiving the records.

96.  Plaintiff is not attempting to broaden his discovery rights under Rule 16.
See e.g. North v. Walsh, 881 F.2d. 1088-1097 (D.C. Cir 1989).(a defendant's
right to obtain information from the government in discovery under Federal
Rules of Criminal Procedure is separate and idependent from his right to
obtain the information under the FOIA. "Indeed, there are situations in which
FOIA will permit access to information that would not be available through
discovery".) Id. at 1096, But rather Plaintiff seeks all responsive documents
which would; a) comply with the FOIA/PA; and b) comport to the limitations
of Rule 16.

97.  Lastly, Plaintiff disagrees and objects to defendant's claimed exemptions.

98.       this Honorable Court should review the records to determine whether the
claimed exemptions is valid. See e.g. Lloyd and Henniger v. Marshal, 526 F.

18

Supp. 485, 487 (M.D.Fla. 1981)(in deciding whether particular disclosure represents unwarranted invasion of personal privacy so as to be exempt under subsec (b)(7)(C) of §552, district Court must balance individual's privacy interest in non-disclosure against public interest in disclosure.)

99.    Defendant has redacted the whole page; Plaintiff has no complaint when defendant lawfully excises names, addresses and phone numbers, but surely those pages were not merely names, addresses and the like. See e.g. Vaughn v. Rose, 484 F. 2d. 820, 825-26 (D.C. Cir. 1973)(Entire document's access to which is sought under this section, is not exempt merely because isolated portions of documents need not be disclosed.)

> 100.    Agency relying on generic approach to justify non-
> disclosure of groups of documents, under interfe-
> rence with law enforcement proceedings exemption
> to FOIA request must define categories of documents
> functionally, must conduct document-by-document
> reviw in order to assign document to proper cate-
> gory, and must explain to court how release of each
> category would interfere with proceedings. Manna v.
> U.S. Dept. of Justice, 815 F. Supp 798, 806, (D. New
> Jersey 1993), affirmed, 51 F.3d. 1158 (3rd Cir 1995).

### F.    Conclusion

For the foregoing reasons Plaintiff respectfully request this Honorable Court to deny the Defendants' request for Summary Judgment.

Respectfully Submitted,

Jose M. Chavez-Arellano
Pro se, Reg. No 93054-079

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on March, 30, 2006, I served a copy of the foregoing Plaintiff's Memorandum in opposition to Defendants' Motion for Summary Judgment, and supporting appendixes by first class mail, postage pre-paid, to the following:


Karen L. Melnik
Assitant U.S. Attorney
Civil Division
555 4th Street, N.W.
Washingto, D.C. 20530


Jose M. Chavez-Arellano
Pro se, Reg. No. 93054-079
FCI Seagoville
P.O. Box 9000
Seagoville, TX 75159-9000


## PROOF OF FILING

This document is hereby filed on the 30 day of March, 2006, pursuant to the holding in Houston v. Lack, 487 U.S. 266, (1988), by placing it in the mail box designated for outgoing legal mail.


Jose M. Chavez-Arellano
Pro se, Reg. No. 93054-079
FCI Seagoville
P.O. Box 9000
Seagoville, TX 75159-9000

**A P P E N D I X**

**" A "**

PART A. THE OFFENSE

Charges and Convictions

1.    Rosalio Moralez-Cabrera and Jose Miguel Chavez-Arellano are named in a four count Indictment filed in the Southern District of Texas at Laredo on April 4, 2000. The Indictment charges the defendants as follows:

2.    Count 1 charges that from on or about March 1, 2000, to on or about March 13, 2000, the defendants conspired to possess with intent to distribute a quantity in excess of 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A).

3.    Count 2 charges that on or about March 1, 2000, Rosalio Morales-Cabrera possessed with intent to distribute a quantity in excess of 50 grams, that is, approximately 173 grams (six ounces), gross weight, of methamphetamine, in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(A).

4.    Count 3 charges that on or about March 4, 2000, Rosalio Morales-Cabrera possessed with intent to distribute a quantity in excess of 50 grams, that is, approximately 193 grams (six ounces), gross weight, of methamphetamine, in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(A).

5.    Count 4 charges that on or about March 13, 2000, the defendants possessed with intent to distribute a quantity in excess of 50 grams, that is, approximately 6,079 grams (14 pounds), gross weight, of methamphetamine, in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(A).

6.    On May 22, 2000, Rosalio Morales-Cabrera entered a guilty plea to Count 4 under Rule 11(e)(1)(B). In return for his plea, and pursuant to a written plea agreement, the Government agreed to dismiss the remaining counts, and to recommend a three level downward adjustment for early acceptance of responsibility, pursuant to U. S. S. G. 3E1.1(a) and (b)(2). The Government also agreed to recommend that the defendant be sentenced at level 33 of the U. S. Sentencing Guidelines, but not less than 120 months, unless the Court found that the defendant qualified for the safety valve provisions of 18 U.S.C. § 3553(f), in which case the Court could depart downward and sentence the defendant at the appropriate level. The Government further agreed to file the appropriate motion at the time of sentencing, or thereafter, and recommend a reduction of sentence pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553, if the defendant rendered substantial assistance to the United States. The defendant agreed to waive his right to appeal the sentence (or the manner in which it was determined) on the grounds set forth in 18 U.S.C. § 3742, or on any ground whatever.

7.    The Court accepted the defendant's guilty plea and ordered a presentence investigation. Sentencing as to Rosalio Morales-Cabrera was held on August 28, 2000. The Court accepted the Government's motion for downward departure for substantial assistance and sentenced the defendant to twenty-seven months custody, a three year term of supervised release, and a $100 special assessment.

3

8.    A jury trial was held as to Jose Miguel Chavez-Arellano on August 17, 2000. The jury found the defendant guilty on Counts 1 and 4 of the Indictment on August 21, 2000. The Court accepted the jury's verdict and ordered a presentence investigation. The defendant remains in custody pending sentencing.

The Offense Conduct

9.    On March 13, 2000, Rosalio Morales-Cabrera and Jose Miguel Chavez-Arellano were arrested by Drug Enforcement Administration (DEA) Agents in Laredo, Texas, and charged with possession with intent to distribute approximately fourteen pounds of methamphetamine.

10.    DEA agents, acting in an undercover capacity, met with Mr. Morales-Cabrera on March 1, 2000, for the purpose of negotiating the purchase of twenty-five pounds of methamphetamine. The meeting took place at the Danny's Restaurant located at 4120 San Bernardo in Laredo, Texas. During this meeting, Mr. Morales-Cabrera negotiated with agents for the sale of twenty-five pounds of methamphetamine. He told agents that on this date, he could deliver a pound and a half, which was in his hotel room across the street. The agents and Mr. Morales-Cabrera proceeded to the Siesta Motel, to the defendant's room, where the agents negotiated for the purchase of a half-pound for $2,500. He further told agents that the methamphetamine was of high purity. Mr. Morales-Cabrera further stated that he had twenty pounds in San Antonio, Texas, and an additional fifty pounds in Nuevo Laredo, Tamaulipas, Mexico. They agreed to meet later to finalize the sale of the half-pound.

11.    Approximately thirty minutes later, the agents again met with Mr. Morales-Cabrera at the Danny's Restaurant Parking lot. They rode across the street in the undercover vehicle, to Mr. Morales-Cabrera's room. He entered the room for a few moments, and returned to the undercover vehicle, where he delivered to agents 173 grams of methamphetamine for $2,500. The methamphetamine was contained in the sole of a shoe. Mr. Morales-Cabrera explained to the agents that he and his associates would make hidden compartments in shoes to smuggle the methamphetamine into the United States.

12.    On March 4, 2000, the agents met with Mr. Morales-Cabrera at the same Danny's Restaurant. As before, they negotiated for the sale of one-half pound of methamphetamine for $1,900. During their conversation, Mr. Morales-Cabrera told agents that he was the individual who would "cook" the methamphetamine at his lab in Michoacan, and that he was in partnership with other persons who transport the substance from Michoacan to Nuevo Laredo, Mexico.

13.    Mr. Morales-Cabrera told agents that he could deliver a total of twenty-five pounds of methamphetamine on March 7, 2000 for $4,400 per pound. They agreed to the price and to meet later on this larger sale. Since they had agreed to the immediate purchase of one-half pound, the agents and Mr. Morales-Cabrera traveled across the street, to the Siesta Motel, where Mr. Morales-Cabrera delivered to agents 150.6 grams of methamphetamine in the undercover vehicle. The substance was concealed in the bottom of a shoe.

4

14.    On March 7, 2000, the agents met with Mr. Morales-Cabrera at his motel room. The defendant advised agents that he could deliver ten pounds that evening, and that the remainder would be available the following day. They agreed to meet the next day, to finalize the entire transaction, which would involve a total of twenty pounds of methamphetamine.

15.    At a final meeting on March 13, 2000, agents met with Mr. Morales-Cabrera at the Danny's Restaurant in Laredo, for the sale of thirteen pounds of methamphetamine. Mr. Morales-Cabrera was in the company of another individual, later identified as Jose Miguel Chavez-Arellano. Both defendants told agents that the methamphetamine was in a vehicle in the parking lot. When the defendants and the agents stepped out of the restaurant to examine the methamphetamine, the arrest signal was given to surveillance agents. Both defendants were arrested in the parking lot without incident. Approximately thirteen pounds of methamphetamine were recovered from inside a vehicle that had been driven to the parking lot by Mr. Morales-Cabrera.

16.    Mr. Morales-Cabrera testified for the Government at the trial of Mr. Chavez-Arellano. He stated that they both spoke to a woman who telephoned them in Michoacan regarding a person in Laredo, Texas, who was interested in buying methamphetamine. According to Mr. Morales-Cabrera, they traveled together to Laredo, Texas, and stayed at the Siesta Motel. Mr. Chavez-Arellano remained in Nuevo Laredo, Mexico, to wait for the larger shipment of methamphetamine that Mr. Morales-Cabrera was negotiating to sell to the undercover agents. Mr. Morales-Cabrera further testified that Mr. Chavez-Arellano was the owner of the methamphetamine.

Victim Impact

17.    There are no identifiable victims as a result of this offense. However, because there are no identifiable victims and the offense is one listed at 18 U.S.C. § 3663(c), the defendant is subject to an order of "community restitution." The prosecuting Assistant U.S. Attorney has not responded to this office's request for an assessment of the "public harm" caused by this offense or has been unable to determine the amount of public harm. Therefore, at this time it appears that circumstances exist that make this requirement clearly impracticable and as such, the complication and prolongation of the sentencing process resulting from fashioning of an order of restitution outweighs the need to provide restitution.

Adjustment for Obstruction of Justice

18.    The probation officer has received information that the defendant acted to obstruct justice in this case by testifying untruthfully at his trial. According to the Government, the defendant denied involvement in the offense, explaining that he accompanied Mr. Morales-Cabrera to the meeting with the undercover officers at the restaurant, not knowing what it was about. The defendant testified that Mr. Morales-Cabrera told him that they were going to collect some money, and to go along with any conversation that came up.

19.    The Government has also advised that Mr. Morales-Cabrera received a handwritten letter, presumably written by or for the defendant. The content of the letter, which was sent to Mr.

5

# A P P E N D I X

## " B "

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | M6-00-0103 | ███████████ |
| | 3. File Title | |
| 4. Page 2 of 3 | ███████████████████ | |
| 5. Program Code | 6. Date Prepared | |
| SEP-582 | 03/14/00 | |

9.  TF/I ███████████████████████████████████████████

███████████████████████████████████████████████████████████

11. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ and

17. TF/Inv. ███████████████ "GATO", and later identified as Jose
Miguel CHAVEZ-Arellano.  TF/Inv. ████████ engaged in conversation with
████████████ CHAVEZ-Arellano.

18. A short while later TF/Inv. ████████ asked ████████████ CHAVEZ-Arellano
the Methamphetamine was ready. ████████████████ CHAVEZ-Arel█

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# Case Inventory

**Case:** M6-00-0103    **Date:** 09/09/2002    **Group: 2**

| Exhibit | Description | Last Action | Last Action Date | Disposal Dat | Location |
|---|---|---|---|---|---|
| N13 | One set of Room Keys, from defendant CHAVEZ-Arellano | Destroyed | 08/19/2002 | 07/15/2002 | DSP |
| N14 | One set of Ford car keys from defendant CHAVEZ-Arellano | Transferred Out | 05/01/2002 | 04/29/2002 | DSP |

113



B) 5.

6. ████████████ CHAVEZ-ARRELLANO AND TF/INV. ████ WALKED TO A FORD BRONCO (TX LP# IN THE RESTAURANT PARKING LOT IN ORDER TO SHOW TF/INV. ████ THE METHAMPHETAMINE. ████████ CHAVEZ-ARRELLANO WERE ARRESTED AND 13 POUNDS OF METHAMPHETAMINE WERE SEIZED FROM THE BRONCO. THE 13 POUNDS WERE PACKAGED IN FIVE SQUARE BUNDLES, WRAPPED IN BROWN PACKING TAPE.

7. ████████████████████ CHAVEZ-ARRELLANO ADMITTED KNOWLEDGE, HOWEVER WAS UNWILLING TO COOPERATE WITH AUTHORITIES. FURTHER INFORMATION WILL BE REPORTED AS IT BECOMES AVAILABLE.

C) DOCUMENTS TAKEN FROM THE DEFENDANTS AT THE TIME OF THEIR ARRESTS, ARE AS FOLLOWS:

JOSE MIQUEL CHAVEZ-
1. SCRAP OF PAPER- "451991527 " HANDWRITTEN

2. SCRAP OF PAPER- "6455890 NORA" HANDWRITTEN

3. BUSINESS CARD FOR- "EL CONEJO BUS LINES"

(956)

2

## RECEIPT FOR CASH OR OTHER ITEMS

| TO: (Name, Title, Address ((including ZIP Code)), if applicable) | | |
|---|---|---|
| ■■■■■■■■■■ S/H | **FILE NO.** MG-00-0103 | **G-DEP IDENTIFIER** ■■■■ |
| | **FILE TITLE** ■■■■■■■■ | |
| | **DATE** 11-17-00 | |

**DIVISION / DISTRICT OFFICE**

Loredo D.O.

I hereby acknowledge receipt of the following described cash or other item(s),
which was given into my custody by the above named individual.

| AMOUNT or QUANTITY | DESCRIPTION OF ITEM(S) | PURPOSE (If Applicable) |
|---|---|---|
| N-13 | Keys | Returne from Trial |
| N-15 | Calling Cards | |
| ■■■■■■■■■■ | | |

**RECEIVED BY (Signature)**

**NAME AND TITLE (Print or Type)**

**WITNESSED BY (Signature)**

**NAME AND TITLE (Print or Type)**

**DEA Form — 12**
(Apr. 1983)

Previous edition dated 9/77 may be used until stock is exhausted.

## RECEIPT FOR CASH OR OTHER ITEMS

| TO: (Name, Title, Address ((including ZIP CODE)), if applicable) | FILE NO. M6-00-0103 | G-DEP IDENTIFIER |
|---|---|---|

S/A ████████████████

FILE TITLE

DATE 8/16/00

DIVISION/DISTRICT OFFICE

Houston
Laredo

I hereby acknowledge receipt of the following described cash or other item(s), which was given into my custody by the above named individual.

| AMOUNT or QUANTITY | DESCRIPTION OF ITEM(S) | PURPOSE (If Applicable) |
|---|---|---|
| N-11 | Duffel Bag | Out for |
| N-13 | Keys | Trial. |
| N-14 | Keys    Andy G. | |
| N-15 | Phone Cords | |
| ██████████ | ██████████ | |

| RECEIVED BY (Signature) ████████ | NAME AND TITLE (Print or Type) ████████ |
|---|---|
| | NAME AND TITLE (Print or Type) |

A P P E N D I X

" C "

1  to the lab because that's the way it was delivered.

2  So, in its entirety, it was sent to the lab.

3  Q.    So the issue of fingerprints went by the side?

4  A.    Sir?

5  Q.    So the issue of fingerprints went by the side, and

6  nobody thought about submit -- or nobody safeguarded

7  the fact that possibly there was some fingerprints and

8  takes the precaution of trying to lift them if there

9  are any?

10 A.    You can lift.  The only thing is, like I said,

11 depending -- first of all, we have to go -- once we

12 send the items to the lab, they have to be handled.

13 So --

14 Q.    But before they were sent to the lab, nobody --

15 A.    Nobody processed the prints; that is correct.

16 Q.    And you being the case agent, you could have said:

17 We need to send this for fingerprints?  You could have

18 said that?

19 A.    Yes, sir, we could have.

20 Q.    And that could have been sent before it went to

21 the lab?

22 A.    Yes, sir.

23 Q.    Because nobody had handled that, other than

24 whoever saw this bundle?  They brought it in, and they

25 could have taken the precaution of saying, Hey, let's

1   see what the case agent wants to do.

2           That could have been done?

3   A.    It could have.

4   Q.    But it was not?

5   A.    Not to my knowledge.

6   Q.    And did you ask anybody whether they had tested it

7   because you thought it would be important to take this

8   to the local police department?

9           MR. GUARDIOLA:  Your Honor, I'm going to

10  make an objection to that.  He's asking the same

11  question again, Did anybody take the packages to be

12  fingerprinted.  He said no.

13          THE COURT:  Mr. Trevino?

14          MR. TREVINO:  At -- the local police has

15  some experts in fingerprints.

16          THE COURT:  Now, in response to his

17  objection, that's what I wanted to know, if you thought

18  about somewhere also.

19          All right, I'll let you answer that question.

20          THE WITNESS:  No, sir.

21  BY MR. TREVINO:

22  Q.    And the local police department has a limited way

23  of lifting fingerprints, right?  And they have

24  fingerprinting experts here locally, do they not?

25  A.    They have people that can read the fingerprints

1    and people that can develop the fingerprints.

2    Q.   And people who can lift the fingerprints?

3    A.   Well, by lifting these prints that you can lift

4    and prints that you can photograph, it depends on what

5    kind of analysis is done.

6    Q.   And the fingerprints on this packages could have

7    been lifted or photographed?

8    A.   That is correct.

9    Q.   But we won't know, because nobody did that?

10   A.   No, sir.

11                MR. TREVINO:  Now, no further questions,

12   Your Honor.

13                THE COURT:  All right.  Any redirect?

14                MR. GUARDIOLA:  I just have just a few

15   questions.

16                THE COURT:  All right.

17                    REDIRECT EXAMINATION

18   BY MR. GUARDIOLA:

19   Q.   Agent Vasquez, was Joe Lopez, Investigator Joe

20   Lopez, the undercover agent, was he at any time the --

21   a member of the surveillance team?

22   A.   No, sir.

23   Q.   So would it be possible for Lopez to know where

24   every single member of the surveillance team was at any

25   one time or all the time?

# A P P E N D I X

## " D "

1    A.    Yes, sir, they can.

2    Q.    Where are they now, right now?

3    A.    In evidence.

4    Q.    Now, you are telling the ladies and gentlemen that

5    the first meeting, the first conversation, was taped?

6    A.    Yes, sir.

7    Q.    That was between Chavez-Arellano, I'm sorry.  That

8    was between Rosalio and Lopez?

9    A.    Morales-Cabrera, yes.

10   Q.    You are saying that the second, third, fourth and

11   fifth conversations were all also taped?

12   A.    As long as there was a meet that occurred on those

13   particular days, they were taped.

14   Q.    Okay.  Now, do you recall what happened, the last

15   conversation and what transpired and who spoke in the

16   last conversation?

17   A.    I can't recall as far as what was -- I think it

18   was just maybe conversation, but on the tapes sometimes

19   you can hear very well because of your location and

20   sometimes because of background noise, music

21   especially.  In a restaurant, we have some problems

22   understanding what's going on.

23   Q.    Well, I'm not asking what you did here, I'm asking

24   what you heard, sir.

25   A.    I don't recall.

1    Q.   You don't recall?

2    A.   No.

3    Q.   Do you recall hearing Chavez-Arellano speak?

4    A.   I recall three voices.   There were different

5    voices, but I couldn't make out what they were saying.

6    Q.   Was one of them the waiter or waitress?

7    A.   I believe the waitress came up once and asked

8    something, but I don't remember what the question was.

9    Q.   So you have one, Mr. Rosalio Morales-Cabrera, that

10   you recognize?

11   A.   Well, like I said, I would have to listen to the

12   tape so I can remember, because I don't remember

13   exactly whose voice I heard that day.

14   Q.   And Lopez would have definitely been there,

15   because they're the ones that remembers the most?

16   A.   Lopez would have the actual microphone on him so

17   he would probably be the one that came out more

18   clearly.   Yes, sir.

19   Q.   When you would have the meetings, would you record

20   those meetings, the debriefings?

21   A.   No, sir.

22   Q.   When Mr. Rosalio Cabrera, Rosalio Morales-Cabrera,

23   when he was arrested, was the conversation between him

24   and whomever recorded?

25   A.   Yes, sir.

1   A.   I would say that would be incorrect.  I was not

2   part of the arrest.  I was not part of the

3   surveillance.  The knowledge that I have of the case,

4   that's what I have, from reading the case file.

5   Q.   You have knowledge of tapes, do you not?

6   A.   Yes, I do.

7   Q.   Is that part of the case, sir?

8   A.   Yes, they are.

9   Q.   And where are those tapes?

10  A.   I have them.

11  Q.   And was that information ever made part of the

12  report?

13  A.   That they were taken, yes.

14  Q.   Yes.  And that whatever is there was inaudible,

15  was that made part of the report?

16  A.   No.

17  Q.   No.

18  A.   It was just a report that a recording was made,

19  but it's basically up to the agent whether he wants to

20  say that they were inaudible or not.  I didn't write

21  the reports.

22  Q.   Did you give this information to Mr. Vasquez or

23  Mr. Lopez, or did you see to it that this -- that the

24  content of the information of -- of the inaudible tape

25  or tapes became part of this investigation and part of

1  Q.   And are you saying the four tapes or the five

2  tapes that you have, that they were all inaudible?

3  A.   Yes.  To me, they were.

4  Q.   To you they were.  Do you think that after they

5  debriefed they would see what the tapes contained?

6  Couldn't that be procedure?

7  A.   It would be all up to the case agent.  I'm not

8  sure.  It's -- sometimes when you are recording a

9  conversation that's coming over the undercover

10  transmitter, you can already tell it's inaudible, so

11  sometimes reference is not made to the tapes because

12  they're inaudible.

13  Q.   Would it sound ridiculous that you went through an

14  investigation and went through the five tapes, and at

15  the very end we found out that the tapes didn't work,

16  none of the five, after a period of 13 days?

17  A.   Sorry.  The question?

18  Q.   Wouldn't that be absurd?

19              MR. TREVINO:  Could I approach the

20  witness, Your Honor?

21  BY MR. TREVINO:

22  Q.   You had some recordings on the first?

23  A.   Yes.

24  Q.   Some recordings on the 3rd, some recordings on the

25  8th, I believe the 3rd.  First, 3rd, 4th 8th, and the