# Exhibit "A"

1    We're about to call the last one.

2                    MR. TREVINO:  There's no comments from

3    me.

4                    THE COURT:  Okay.  We're going to go

5    back on record.

6            Let's call our next witness.

7                    MR. GUARDIOLA:  Your Honor.  Rosalio

8    Morales.

9                    THE COURT:  Yes, sir.  Step this way.

10   The interpreter will provide translation.

11            (Witness sworn.)

12                    THE WITNESS:  I swear.

13                    THE COURT:  Thank you, sir.  Please be

14   seated up there.

15            All right.  Ladies and gentlemen, what we're

16   going to do is we'll have the lawyers ask the question

17   in English.  Mr. Sully will provide an interpretation

18   in Spanish.  The witness will answer in Spanish, and

19   Mr. Sully will provide an interpretation in English.

20            Why don't you proceed, Mr. Guardiola.

21      ROSALIO MORALES-CABRERA, GOVERNMENT WITNESS, SWORN

22                    DIRECT EXAMINATION

23   BY MR. GUARDIOLA:

24   Q.    Good morning, sir.  What is your name, please?

25   A.    Rosalio Morales-Cabrera.

1    Q.    And how old are you, Mr. Morales?

2    A.    Thirty-three years old.

3    Q.    And where do you reside?

4    A.    In Apatzingan, Michoacan.

5    Q.    Okay.  Where is Apatzingan?

6    A.    Apatzingan, it's four hours away from Morelia, the

7    capital of Michoacan.

8    Q.    Do you know an area there in Michoacan called Las

9    Colonias, Michoacan?

10   A.    Yes.

11   Q.    Now -- well, let me ask you.  How far is Las

12   Colonias from Apatzingan?

13   A.    Thirty minutes.

14   Q.    Now, do you know also a person by the name of Jose

15   Chavez-Arellano?

16   A.    Yes.

17   Q.    Okay.  Do you know him by any nickname?

18   A.    Yes.  El Gato.

19   Q.    And is he here in the courtroom?

20   A.    Yes.

21   Q.    Can you point him out to us?

22   A.    It's him.

23   Q.    What is he wearing?

24   A.    He's got a brown-colored shirt on with little

25   checks, and he's beside -- the person besides him is a

1          (The jury enters the courtroom.)

2              THE COURT:  Thank you.  Please be

3   seated.  All right.  We'll resume with questions for

4   Mr. Morales-Cabrero.

5          You do recall, sir, you're still under oath.

6              THE WITNESS:  Yes.

7   BY MR. TREVINO:

8   Q.   Mr. Morales, this lady that called you, who is

9   she?

10  A.   Her name is Alicia Orvides-Garcia.

11  Q.   And where did she call you from?

12              INTERPRETER:  Where?

13              MR. TREVINO:  Where did she call you?

14              THE WITNESS:  She was calling me from

15  here.

16  BY MR. TREVINO:

17  Q.    From Nuevo Laredo?

18  A.   Laredo.

19  Q.   And she is the one that connected you with this

20  Lopez person?

21  A.   Yes.

22  Q.   And you established contact with Mr. Lopez from

23  Apatzingan?

24  A.   It was through her that we did all that.

25  Q.   They both went?

1    THE COURT:  Good afternoon, Mr. Lopez.

2  If you could make your way up here to the witness box.

3  And before you take your seat, Ms. Bettis will

4  administer the oath.

5    If you could raise your right hand please,

6  sir.

7    (The witness is sworn.)

8    THE WITNESS:  Yes.

9    THE COURT:  Yes, sir.  If you could take

10  a seat there.  It's not a very comfortable seat.  I'd

11  ask you to try to adjust the microphone so you could

12  speak directly into it.

13    THE WITNESS:  Good afternoon.

14    THE COURT:  The seat doesn't adjust,

15  sorry.

16    MR. GUARDIOLA:  May I proceed, Your

17  Honor?

18    THE COURT:  Yes, you may.

19    JOSÉ LOPEZ, JR., GOVERNMENT WITNESS, SWORN

20    DIRECT EXAMINATION

21  BY MR. GUARDIOLA:

22  Q.   Good afternoon, sir.  What is your full name,

23  please.

24  A.   Jose Lopez, Junior.

25  Q.   And how are you employed?

1    A.    I'm an investigator with the Webb County Sheriff's

2    Office and currently assigned to a multi-jurisdictional

3    narcotics financial task force.

4    Q.    What is that called, the task force?

5    A.    It's called the Laredo Multi-agency Financial

6    Disruption Task Force.

7    Q.    Okay.  And how long have you been at this, working

8    with this task force?

9    A.    About three months.

10   Q.    Before this task force, how were you -- what were

11   you doing?

12   A.    I was assigned to the Drug Enforcement

13   Administration or DEA Task Force.

14   Q.    How long were you assigned to the DEA Task Force?

15   A.    About eight-and-a-half, eight-and-a-half years,

16   nine years.

17   Q.    Years?

18   A.    Years.

19   Q.    And can you just very generally and briefly

20   describe what your duties were there at the DEA Task

21   Force.  What did you do generally?

22   A.    We initiate cases as well as follow-up cases on

23   narcotic violators, or surveillance, undercover report

24   writing, informant handling.

25   Q.    Okay.  So you did -- did you do undercover work?

1    THE COURT:  You may proceed.

2        MR. GUARDIOLA:  Yes, sir.

3    JOSE RUBEN MARTIN, GOVERNMENT WITNESS, SWORN

4            DIRECT EXAMINATION

5  BY MR. GUARDIOLA:

6  Q.    Good afternoon, sir.  What is your name, sir?

7  A.    Jose Ruben Martin.

8  Q.    And how are you employed?

9  A.    I'm a special agent with DEA in Laredo, Texas.

10  Q.    How long have you been with the DEA?

11  A.    Two years.

12  Q.    Okay.  Did you have occasion to assist in this

13  particular investigation?

14  A.    I adopted that case after the initial case agent

15  was transferred out of the task force.

16  Q.    Who would that be?

17  A.    Mr. Bernardo Lopez.

18  Q.    Bernardo what?

19  A.    Lopez -- I mean Vasquez.

20  Q.    Did you at any point after, like you say, adopted

21  the investigation, did you take custody of any

22  controlled substance in reference to this case?

23  A.    Yes, I did.

24  Q.    And what is it that -- what controlled substance

25  did you take custody of?

1    Before you take your seat, we'll have you

2  take the oath.

3         (Witness sworn.)

4              THE WITNESS:  Yes, ma'am, I do.

5              THE COURT:  Thank you.  Please be

6  seated, sir.  The chair does not adjust, but the

7  microphone does.  Try to speak directly into it.

8              THE WITNESS:  Very good, sir.

9              MR. GUARDIOLA:  May I proceed, Your

10  Honor?

11              THE COURT:  Yes, you may.

12         BERNIE VASQUEZ, GOVERNMENT WITNESS, SWORN

13              DIRECT EXAMINATION

14  BY MR. GUARDIOLA:

15  Q.   Good morning, sir.  What is your name?

16  A.   Bernardo Vasquez.

17  Q.   And what is your occupation?

18  A.   I'm an investigator with the Laredo Police

19  Department.

20  Q.   Do you have any particular kind of a department?

21  A.   I'm assigned to the Financial Agent Task Force.

22  Q.   Is Joe Lopez also a member of that financial task

23  force?

24  A.   Yes, sir, he is.

25  Q.   Previous to the financial task force, were you

1   assigned anywhere else?

2   A.   Yes, sir.

3   Q.   Where?

4   A.   Drug enforcement task force.

5   Q.   And is that commonly referred to as DEA?

6   A.   Yes, sir.

7   Q.   What were your duties, in general, at DEA?

8   A.   The latter portion I was assigned to a

9   methamphetamine group.  Methamphetamine Initiative

10  Group, dealing in methamphetamine investigations.

11  Q.   Okay.  And while you were in that group, did you

12  have occasion to assist Investigator Joe Lopez in a

13  case involving an undercover buy of meth on March 13,

14  2000?

15  A.   Yes, sir.

16  Q.   Okay.  Were you involved in the surveillance of

17  Danny's Restaurant that day?

18  A.   Yes, sir.

19  Q.   Can you tell us what the purpose was of the

20  surveillance?

21  A.   On that day, my responsibility was to go ahead and

22  have a surveillance of the restaurant, the meet place.

23  And it was -- I believe there were three of us in a

24  vehicle, listening also to the conversations.

25  Q.   You said meet place.  What is that?

1      SHAUN HACKING, GOVERNMENT WITNESS, SWORN

2               DIRECT EXAMINATION

3    BY MR. GUARDIOLA:

4    Q.    Good morning, sir.  What is your name, please?

5    A.    Shaun Hacking.

6    Q.    For the record, could you spell out your last

7    name?

8    A.    H-A-C-K-I-N-G.

9    Q.    Okay.  And how are you employed?

10   A.    I'm a special agent with the Drug Enforcement

11   Administration.

12   Q.    How long have you been with Drug Enforcement

13   Administration?

14   A.    Just a little less than three years.

15   Q.    Okay.  Did you participate back on March the 13th

16   of this year, 2000, in any surveillance?

17   A.    Yes, I did.

18   Q.    Where was your surveillance?

19   A.    It was in the area of Danny's Restaurant on San

20   Bernardo, here in Laredo, Texas.

21   Q.    Okay.  And did you -- well, what time did you

22   participate in this surveillance?

23   A.    It was sometime in the afternoon.

24   Q.    Did you see any vehicle that day during your

25   surveillance relevant to the investigation?

1   seated.  It's not a comfortable chair, but try to

2   adjust the microphone so you can speak directly into

3   it.

4              All right.  Please proceed, Mr. Guardiola.

5                   MR. GUARDIOLA:  Yes, Your Honor.

6           ALLEN SAWYER, GOVERNMENT WITNESS, SWORN

7                     DIRECT EXAMINATION

8   BY MR. GUARDIOLA:

9   Q.   Good afternoon, sir.  What is your name, please?

10  A.   Allen D. Sawyer.

11  Q.   And how are you employed?

12  A.   As a forensic chemist at the DEA lab in Dallas.

13  Q.   Okay.  Can you tell us what the address is to your

14  DEA lab?

15  A.   1880 Regal Row.

16              THE COURT:  Can you spell that, please,

17  sir.

18              THE WITNESS:  R-E-G-A-L R-O-W.  That's

19  two words.

20              THE COURT:  Regal row.  I see.

21  BY MR. GUARDIOLA:

22  Q.   And that's in Dallas, Texas?

23  A.   Yes, sir.

24  Q.   How long have you been working as a forensic

25  chemist?

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA　§
　　　　　　　　　　　　　　§
　　　　vs.　　　　　　　　§
　　　　　　　　　　　　　　§
JOSE MIGUEL CHAVEZ-ARELLANO　　Docket No. 5:00CR00355-002

---

Prepared For:　　　　Honorable Keith P. Ellison
　　　　　　　　　　United States District Judge

Prepared By:　　　　Mauro F. Luna
　　　　　　　　　　Senior U. S. Probation Officer
　　　　　　　　　　Laredo, Texas
　　　　　　　　　　(956) 790-1720, Ext. 306

Assistant U.S. Attorney　　　　　　　Defense Counsel
Andy Guardiola　　　　　　　　　　Armando Trevino
1100 Matamoros, Suite 200　　　　　　1519 Washington
Laredo, Texas 78042　　　　　　　　Laredo, Texas 78040
(956) 723-6523　　　　　　　　　　(956) 726-1638

Sentencing Date:　　　　November 2, 2000, at 1:00 p.m.

Offense:　　Count 1:　　Conspiracy to possess with intent to distribute a quantity in excess
　　　　　　　　　　　of 50 grams of methamphetamine.  21 U.S.C. §§ 846, 841(a)(1),
　　　　　　　　　　　and 841(b)(1)(A)

　　　　　　Count 4:　　Possess with intent to distribute a quantity in excess of fifty grams,
　　　　　　　　　　　that is, approximately 6079 grams, (14 pounds), gross weight, of
　　　　　　　　　　　methamphetamine. 21 U. S. C. §§  841(a)(1), and 841(b)(1)(A)

　　　　　　　　　　　Each Count:  10 years to life imprisonment; not less than 5 years
　　　　　　　　　　　supervised release; $4,000,000 fine; $100 special assessment

Release Status:　　　　In federal custody since date of arrest on March 13, 2000, under a
　　　　　　　　　　　$300,000 bond requirement.

Detainers:　　　　　　U. S. I. N. S., Laredo, Texas, for deportation

Codefendants:　　　　Rosalio Morales-Cabrera, 5:00CR00355-001, sentenced on August
　　　　　　　　　　　28, 2000, to twenty-seven (27) months custody; three (3) years
　　　　　　　　　　　supervised release; $100 special assessment

Related Cases:　　　　None

Date Report Prepared:　　September 19, 2000　　　　　　　Date Report Revised:

MORALES - DIRECT

1  Q.  And how did you get here, what means of

2  transportation?

3  A.  I arrived walking, and I went to a hotel.

4  Q.  In Laredo?

5  A.  Yes, from Nuevo Laredo here to Laredo.

6  Q.  And from Apatzingan to Nuevo Laredo?

7  A.  From Apatzingan I arrived on a bus.  I left at

8  11:15 or 11:45.

9  Q.  Okay.

10  A.  I arrived to -- at Guadalajara, and from there I

11  took a plane to Monterrey.  There at Monterrey, we took

12  a taxi down to the bus station, and from the bus

13  station I took another bus from there to Nuevo Laredo.

14  Q.  And did you make this trip by yourself or with

15  somebody else?

16  A.  No, I traveled with him.

17  Q.  With who?

18  A.  With Arellano.

19  Q.  Now, what -- Mr. Morales what was the purpose of

20  your trip to Laredo?

21  A.  A person that called us said that he wanted

22  something, but I told him I didn't have anything.

23  Q.  And what something were they referring to?

24  A.  They wanted a drug.

25  Q.  Do you know what type of drug?

# Exhibit "B"

1              JOSE LOPEZ, RECALLED, PREVIOUSLY SWORN

2                FURTHER REDIRECT EXAMINATION

3     BY MR. GUARDIOLA:

4     Q.    Investigator Lopez, are you the same Jose Lopez

5     that testified earlier in this trial?

6     A.    Yes.

7     Q.    And earlier you testified that you were at Danny's

8     Restaurant meeting with -- you testified with Rosalio

9     Morales and the defendant, Mr. Chavez?

10    A.    Yes.

11    Q.    Were you wearing any kind of electronic recording

12    equipment at that time?

13    A.    Yes, I was.

14    Q.    Just briefly, what kind of electronic recording

15    equipment?

16    A.    A transmitter, transmitter which was recording the

17    conversation, the undercover conversation between

18    myself and Rosalio Morales.

19    Q.    Okay.  And did you ever at a subsequent time after

20    that, listen to the end result of those recorded

21    conversations?

22    A.    No, I didn't.

23    Q.    Now, directing your attention towards the latter

24    part of the conversation of where you stated earlier

25    that you-all left the restaurant, will you tell us

1   again what your recollection is of what you said to

2   anyone of the individuals, Rosalio or the defendant?

3   A.   On the day of the arrest?

4   Q.   Yes.

5               THE COURT:  Can we narrow it some?

6   BY MR. GUARDIOLA:

7   Q.   Okay.  Well, not the -- well, on the day of the

8   arrest, while leaving, at the time you were leaving

9   Danny's Restaurant.

10  A.   We got up from the booth and we walked towards the

11  door.  Rosalio remained at the cash register to pay the

12  bill.  Myself and the defendant walked outside.

13          I asked the defendant where it was and he

14  gestured to the direction of the load vehicle.

15              MR. GUARDIOLA:  Now, may I approach the

16  witness, Your Honor?

17              THE COURT:  Yes.

18  BY MR. GUARDIOLA:

19  Q.   Now I'm going to play for you a tape that's been

20  introduced into evidence as Exhibit Number 2.  Oh, I'm

21  sorry.  I was looking at the wrong piece of equipment.

22          I'm going to play for you a tape that's been

23  introduced into evidence already as Defendant's Number

24  2, and I am going to ask you if you can listen to the

25  tape and if you can tell us to the best of your

1   ability, you having been the person who was there

2   present, if you can tell us what it is that's on the

3   recording.

4           (Tape played aloud in courtroom.)

5               THE WITNESS:  Can I listen to it again?

6               THE COURT:  Certainly.

7           (Tape played aloud in courtroom.)

8   BY MR. GUARDIOLA:

9   Q.    Would you like for me to play it again, or do you

10  have an idea?

11  A.    No, I've got an idea.

12  Q.    Can you tell us?

13  A.    That was me asking the defendant, "Pa donde

14  vamos?"

15              INTERPRETER:  "Where are we going?"

16  BY MR. GUARDIOLA:

17  Q.    Okay.  And does that correspond to your prior

18  testimony when you testified that a gesture was made?

19  A.    Yes.

20              MR. GUARDIOLA:  That's all we have, Your

21  Honor.

22              THE COURT:  That's all you heard?

23              THE WITNESS:  There was another voice

24  that -- I distinctly recognize my voice.

25              THE COURT:  Can you identify the other

# Exhibit "C"

1    A.    Yes, sir, they can.

2    Q.    Where are they now, right now?

3    A.    In evidence.

4    Q.    Now, you are telling the ladies and gentlemen that

5    the first meeting, the first conversation, was taped?

6    A.    Yes, sir.

7    Q.    That was between Chavez-Arellano, I'm sorry.  That

8    was between Rosalio and Lopez?

9    A.    Morales-Cabrera, yes.

10   Q.    You are saying that the second, third, fourth and

11   fifth conversations were all also taped?

12   A.    As long as there was a meet that occurred on those

13   particular days, they were taped.

14   Q.    Okay.  Now, do you recall what happened, the last

15   conversation and what transpired and who spoke in the

16   last conversation?

17   A.    I can't recall as far as what was -- I think it

18   was just maybe conversation, but on the tapes sometimes

19   you can hear very well because of your location and

20   sometimes because of background noise, music

21   especially.  In a restaurant, we have some problems

22   understanding what's going on.

23   Q.    Well, I'm not asking what you did here, I'm asking

24   what you heard, sir.

25   A.    I don't recall.

1    Q.    And are you saying the four tapes or the five

2    tapes that you have, that they were all inaudible?

3    A.    Yes.  To me, they were.

4    Q.    To you they were.  Do you think that after they

5    debriefed they would see what the tapes contained?

6    Couldn't that be procedure?

7    A.    It would be all up to the case agent.  I'm not

8    sure.  It's -- sometimes when you are recording a

9    conversation that's coming over the undercover

10   transmitter, you can already tell it's inaudible, so

11   sometimes reference is not made to the tapes because

12   they're inaudible.

13   Q.    Would it sound ridiculous that you went through an

14   investigation and went through the five tapes, and at

15   the very end we found out that the tapes didn't work,

16   none of the five, after a period of 13 days?

17   A.    Sorry.  The question?

18   Q.    Wouldn't that be absurd?

19              MR. TREVINO:  Could I approach the

20   witness, Your Honor?

21   BY MR. TREVINO:

22   Q.    You had some recordings on the first?

23   A.    Yes.

24   Q.    Some recordings on the 3rd, some recordings on the

25   8th, I believe the 3rd.  First, 3rd, 4th 8th, and the

1   surveillance was at Danny's Restaurant?

2   A.    No.

3   Q.    Okay. Go ahead.

4   A.    And he called me about 6:00, more or less.

5   Surveillance units went out, and they established

6   surveillance around the restaurant and I believe around

7   the hotel.  I showed up about 45 minutes later.  When I

8   showed up, he was already there.

9   Q.    Who?

10  A.    Rosalio.  And he was accompanied by the defendant.

11  They were sitting in a booth on the northeast side of

12  the restaurant, by the windows in a corner.

13  Q.    Okay.  And what did you do when you saw them?

14  A.    I went and sat with them.  Rosalio introduced the

15  defendant to me.  He introduced him as Gato.  We -- you

16  know, we talked for a little bit.  We ate, and then

17  after that, I specifically asked Rosalio and the

18  defendant if they had the crystal ready for me.

19  Q.    Is that the word you used?

20  A.    Yes, I did.

21  Q.    Okay.  And what did he say or who answered?

22  A.    I looked at the defendant.  He replied yes.  I

23  looked at Rosalio and he replied yes.

24  Q.    Okay.  When you say you were sitting in a booth,

25  what type of booth is that?  How close were you?

1  for you to consider in listening to the evidence in

2  this case.

3      Thank you, ladies and gentlemen.

4      THE COURT:  Thank you, Mr. Trevino.

5      All right.  Counsel, we have concluded our

6  opening statements.  Does it make sense to break for

7  lunch now or do you want to begin with testimony.

8      MR. TREVINO:  I'd like to break for

9  lunch now.

10      MR. GUARDIOLA:  I don't care, Your

11  Honor.  If it's more convenient for the jury . . .

12      THE COURT:  Why don't we break now.

13  They've been at it since pretty early.

14      All right.  Before you are released, let me

15  go over it one more time.  It's absolutely important to

16  the process and to the integrity of the judicial system

17  that you not either make contact with anyone else or

18  begin discussion of the case among yourselves.  Either

19  one could jeopardize the entire proceeding and require

20  that we re-do it with a new set of jurors.

21      And believe me, it can happen very

22  innocently.  You think: I heard what the judge said,

23  but surely he doesn't mean I can't tell my husband.

24  And then your husband casually mentions something to a

25  colleague at work and the colleague says, Well, yeah.

1      THE COURT:  Okay.  You may step down.

2          Thank you very much, sir.

3          All right.  Ladies and gentlemen, we now have

4   reached that point in the case where we are going to

5   hear the tape.

6          What I would suggest is that, Mr. Sully,

7   maybe if you could control the tape, that way you can

8   let it -- you can stop it when you need to make an

9   interpretation and that way it won't go for too long

10  without -- or would you rather do it another way?

11      MR. TREVINO:  The only thing of concern

12  to me would be the very last part, Your Honor.

13      THE COURT:  Well, it is wound.  Okay.

14  Why don't we use that tape then.

15      Why don't we make this -- what's the last

16  government exhibit number, or let's make it Defense

17  Exhibit 2.  We'll make all five tapes Defendant's

18  Exhibit 2.

19      They are admitted without objection; is that

20  correct, Mr. Guardiola?

21      MR. GUARDIOLA:  Correct, Your Honor.

22          (Tape played for the jury.)

23      INTERPRETER:  It appeared -- to the best

24  of my ability, Your Honor, it appeared that he said:

25  "Donde esta el Gato,"  Where is El Gato?

1    And the other one said "Ha," and then he

2    said, "Where are we going?"

3    And then the other guy said "Ha" again, and

4    then they started yelling:  Police.  Police, in

5    Spanish, policia.  Up against the car.

6    THE COURT:  Is that the end of the tape?

7    MR. GUARDIOLA:  That's it, Your Honor.

8    Well, Your Honor, I would like to offer

9    other -- other -- Agent Martin is also fluent in

10   Spanish and has a different interpretation of the tape.

11   INTERPRETER:  It's very difficult to

12   understand it, Your Honor.  It could possibly -- that's

13   the best to my ability that I could understand.

14   MR. TREVINO:  The jury can listen to it

15   and take it for what it is.

16   MR. GUARDIOLA:  That's fine.  That is

17   the ultimate issue, and they're the ones to decide.

18   But we still -- we would still want an opportunity to

19   ask Agent Martin what he believes he heard.  And, of

20   course, the jury can hear the translation.

21   THE COURT:  Hadn't he already testified?

22   Oh, I see.

23   MR. GUARDIOLA:  No, Your Honor.

24   THE COURT:  He wasn't there.

25   MR. TREVINO:  And he said they were not

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2              THE COURT:  Thank you.  Please be
 3   seated.  All right.  We're back on the record in our
 4   jury trial, which -- as to which the jury is currently
 5   deliberating.  We have received a note from the jury.
 6   Ms. Bettis will read it.
 7              CASE MANAGER:  The note says:  Judge
 8   Ellison, did Officer Lopez ask Chavez-Arellano first or
 9   Morales-Cabrera first:  "Do you have my crystal?"
10              THE COURT:  I do think whether we allow
11   the jury to see additional -- to have a rereading or a
12   review of a transcript is within the Court's
13   discretion.  I have done some research since I have
14   received this note.  I'll be prepared to hear -- I'm
15   prepared to hear argument from counsel.
16          My presumption with which I began is that we
17   ought to ask the court reporter to locate the pertinent
18   transcript and submit it in transcript form to the
19   jury.  That is the presumption I begin with.  I'll hear
20   from defense counsel first.
21              MR. TREVINO:  I would rather the Court
22   just instruct them to confide in their own memory.
23              THE COURT:  Okay.  Mr. Guardiola?
24              MR. GUARDIOLA:  Your Honor, generally,
25   when the jury comes back with such a question and such
```

# Exhibit "D"

# Memorandum



| Subject | Date |
|---|---|
| Evidence Disposition Verification | 9-4-02 |

To
  File No.

MG-00-0103

From
  

  Assist. Special Agent in Charge
  Laredo District Office

The following signatures verify the disposition of all evidence, exhibits, and/or assets in this case.

1. Non-Drug Exhibits


Custodian

9 Sep 02
Date

2. Drug Exhibits

Custodian

9 Sep 02
Date

3. Assets

All assets have been forfeited or returned

Asset. Forfeiture


G/S

9/9/02
Date

11 a

# *Case Inventory*

Case: M6-00-0103    Date: 09/09/2002    Group: 2

| Exhibit | Description | Last Action | Last Action Date | Disposal Dat | Location |
|---|---|---|---|---|---|
| N13 | One set of Room Keys, from defendant CHAVEZ-Arellano | Destroyed | 08/19/2002 | 07/15/2002 | DSP |
| N14 | One set of Ford car keys from defendant CHAVEZ-Arellano | Transferred Out | 05/01/2002 | 04/29/2002 | DSP |

# RECEIVED

MAY 1 2 2006

**NANCY MAYER** WHITTINGTON, CLERK
U.S. DISTRICT COURT

113

*Monday, September 09, 2002*

*Page 1 of 1*